Argued March 2; affirmed April 20, 1943

## MID-COLUMBIA PRODUCTION CREDIT ASS'N *v.* SMEED

(136 P. (2d) 255)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY and HAY, Associate Justices.

*John D. Ewing,* of Caldwell, Idaho, and *Matthew A. Biggs,* of Ontario (Smith & Ewing, of Caldwell, Idaho, and Biggs & Yturri, of Ontario, on the brief), for appellant.

*George H. Brewster,* of Redmond (Cunning & Brewster, of Redmond, on the brief), for respondent.

ROSSMAN, J. This is an appeal by the defendant from a judgment in the amount of $2,074 entered against him and in favor of one Ed McGreer, intervening plaintiff. The judgment was based upon a verdict. The sole issue presented by the appeal is whether the circuit court erred when it denied the defendant's motion for a directed verdict. The assignment of error, in presenting the issue just mentioned, includes other rulings—those upon the defendant's motions for a nonsuit and for judgment notwithstanding the verdict—but the sole issue is as just stated; that is, whether substantial evidence warranted the verdict.

A corporation entitled Mid-Columbia Production Credit Association, which was the mortgagee of the bands of sheep which we shall shortly mention, instituted this cause as plaintiff, but moved for and was granted a voluntary nonsuit at the start of the trial. The complaint of the intervener, to whom we shall hereafter refer as the plaintiff, alleges that September 9, 1940, he owned some bands of sheep and at that time an individual, named Tom Boylen, Jr., "was purchasing sheep for the defendant, John W. Smeed, and shipping said sheep for the defendant, John W. Smeed, under the following circumstances: That said Boylen would purchase the sheep and give his check in payment thereof, shipping said sheep to the defendant, John W. Smeed, and drawing on the said John W. Smeed for the purchase price of said sheep, and thereafter that the sheep would be delivered to John W. Smeed, who would sell the same and divide the profit between himself and Tom Boylen, Jr., after deducting expenses."

The complaint further alleges that September 19, 1940, Boylen purchased 488 head of sheep of the plain-

tiff at a price of $4.25 per head, making a total price of $2,074. The market value of the sheep, according to that averment, was the same as the sum just mentioned. Continuing, the complaint says: "The aforesaid sheep were sold by the intervening plaintiff to Tom Boylen, Jr., as the agent for the defendant John W. Smeed, and conditionally delivered, the condition being that said sheep were sold for cash, and that payment should be made immediately. * * * delivery of the sheep and payment therefor were to be concurrent acts, * * *." The complaint next says that when the sheep were put into the possession of Boylen he delivered, pursuant to agreement, a check for the amount of the purchase price to the wife of the plaintiff and at the same time shipped the sheep to the defendant. When the check was presented to the bank upon which it was drawn, payment was refused "and said sheep were not paid for." We again quote from the complaint: "By reason of nonpayment for said sheep, title thereto did not pass from Ed McGreer to the defendant John Smeed or to Tom Boylen, Jr., but said sheep were converted by the defendant, John Smeed, to his own use. * * * By reason of the conversion of said sheep by the defendant, plaintiff and the intervener have been damaged in the sum of $2,074.00 with interest * * *."

The answer, after denying virtually all of the averments above mentioned, sets forth four separate defenses. The first of the four alleges that the plaintiff unreasonably delayed presentation of Boylen's check for payment and thereby "waived his right to cash payment and is estopped to deny that the said Tom Boylen, Jr., had not paid for said sheep." The second defense alleges that Boylen's check "* * * was

accepted as full and complete payment for said sheep * * *." The third says that when the plaintiff delivered the sheep to Boylen he knew that the latter "had resold, or was about to resell and ship" the sheep and that he gave Boylen "through his agent, R. E. McGreer, the right or implied right, to deal with said sheep, and all of them, as his own, and * * * thereby unconditionally waived his right to a cash payment for said sheep." The fourth defense alleges that when the plaintiff sold the sheep to Boylen he gave him unconditional possession and full indicia of title whereby the defendant was misled into making the purchase. Further, this defense alleges: "* * * said intervening plaintiff is thereby estopped to deny the title of said Tom Boylen, Jr., and the title of the said John W. Smeed."

The above defenses allege that Boylen "was engaged in the business of raising, buying and selling sheep * * * both as principal and factor, * * *. R. E. McGreer was the duly qualified and acting agent of said Tom Boylen, Jr., and as an incident of said agency the said R. E. McGreer was duly empowered and authorized by Tom Boylen, Jr., both as principal and factor, and to execute contracts and draw checks and drafts in payment thereof." The answer further alleges that September 19, 1940, the plaintiff owned the sheep described in his complaint and on that day the plaintiff "delivered the sheep above mentioned to R. E. McGreer as agent for Tom Boylen, Jr. at Redmond, Oregon. That said R. E. McGreer, acting for and on behalf of the said Tom Boylen, Jr., delivered a check drawn on United States National Bank of Portland, Pendleton Branch, for said sheep * * *."

The defendant contends that the plaintiff sold his sheep to the aforementioned Boylen on credit and that he, the defendant, purchased the sheep from Boylen, making payment in cash. He, of course, claims that the transactions conferred title upon him. The plaintiff, upon the other hand, presents two contentions: (a) That his transaction with Boylen contemplated payment of the purchase price of the sheep concurrently with their delivery; and (b) that Boylen bought the sheep as agent for the defendant pursuant to an agreement whereby the defendant advanced the purchase price and the two would divide the profits, Boylen, however, to assume the expenses attendant upon the purchase.

The evidence indicates that the plaintiff was engaged in the business of breeding sheep. His headquarters were at Redmond. Boylen was not only engaged in breeding sheep, but also in the purchase and sale of them upon an extensive scale. R. E. McGreer, a son of the plaintiff, was an agent of Boylen and possessed the authority which the answer mentions. He testified: "I had been purchasing sheep for Boylen for more than four years and had issued thousands of checks against his bank account." The defendant, who was located at Caldwell, Idaho, was also engaged in the sheep business.

In September, 1940, the plaintiff's bands included 600 ewes which he wished to sell. In the early part of the month he acquainted Boylen with that fact and some days later Boylen agreed to buy them at a price of $4.25 per head, provided he could reject those that were not "solid-mouthed." He and the plaintiff fixed Redmond as the point of delivery. The plaintiff swore that he was distrustful of Boylen's financial responsi-

bility, and hence insisted that payment would have to be made when the sheep were aboard the railway cars at Redmond. September 18, the plaintiff brought to Redmond about 600 ewes and thereupon R. E. McGreer, as agent for Boylen, examined them. He rejected in excess of 100, leaving 488. Due to the late arrival of the train the sheep were not placed aboard the cars until about midnight of September 19. The plaintiff, however, could not wait until that time and instructed his son, R. E. McGreer, to deliver the purchase price check to the plaintiff's wife whose home was in Redmond. As we have seen, the sheep were not put aboard the cars until approximately midnight of September 19. Due to the fact that R. E. McGreer had instructions to inspect a band of sheep at Umli, Oregon, on September 20, he left for the latter point shortly after he had placed aboard the cars the aforementioned 488 sheep, without having written and delivered the purchase payment check. September 21, R. E. McGreer returned to Redmond and delivered to the plaintiff's wife a check for $1,904 which was intended to cover the purchase price. The check was $170 less than the required amount. Somehow he had become confused and had assumed that the sheep were 448 in number. The check was drawn against Boylen's account with the Pendleton Branch of the United States National Bank of Portland. The next day, September 22, was Sunday. On that day Boylen made an assignment for the benefit of his creditors. September 23, Mrs. McGreer deposited the check for collection with the bank in Redmond with which she had an account. The check was dishonored and September 30 the bank debited her account with the amount of the check. The plaintiff has not been paid for the sheep. The evidence indicates that their market value was at least $2,074.

The moment that Boylen received possession of the sheep he shipped them to the defendant at Caldwell, Idaho, and on the 21st of September drew a draft on the defendant for $2,074. The draft was accepted and the money was credited to Boylen's account with the Pendleton Branch September 26.

The defendant testified that he was anxious to purchase sheep of the kind above described and that he and Boylen had had previous negotiations upon the subject. He swore that before Boylen shipped the car he spoke to the defendant on the long distance telephone telling him that he had acquired sheep of the kind which he (defendant) desired and that the price was $4.25. According to the defendant, he replied that he would accept the sheep if they would pass his inspection.

We now quote from the testimony of R. E. McGreer:

"Q. Do you know how Boylen was purchasing these sheep for Smeed?

"A. I do. He was purchasing them on an order from John Smeed, and Smeed was to sell the ewes and divide the profits of the sale with Boylen. Boylen purchased the sheep for $2,074.00, paid me a commission of 25c a head for purchasing them, and Smeed paid $2,074.00 for the sheep. Subsequently, Smeed himself told me that he and Boylen had an arrangement whereby Boylen was purchasing sheep on Smeed's account and he and Boylen were dividing the profits after Smeed sold the sheep, and that Boylen had a considerable sum of money coming from Smeed when an accounting was had between the parties and the profits settled for.

"Q. Was Boylen the agent of Smeed in buying these sheep?

"A. Well, Smeed had ordered Boylen to purchase these sheep for him, and had agreed with Boylen to divide the profits from the sale of them.

Smeed was to advance the exact purchase price of the sheep, Boylen to stand the expenses in connection with buying them, and to be paid for the expense of buying them out of the profits. If that constituted an agency, Boylen was buying them as the agent of Smeed.

"Q. Are you sure that Smeed told you that Boylen was purchasing sheep for Smeed, and that they were to divide the profits?

"A. I am. Smeed told me that at Pendleton and told me that there was about $2,500.00 coming from him to Boylen when they had a settlement on some other matter."

As a witness, the defendant denied that Boylen was his agent, and likewise denied that he and Boylen purchased the sheep as a joint venture. Boylen did not testify.

The following excerpts taken from the defendant's testimony could be deemed by a jury as lending significance and support to the testimony given by R. E. McGreer (the reference is to other transactions which the defendant had with Boylen):

"A. They were a part of the Smyth sheep that was purchased by Tom Boylen for me, and he later sold 800 of them without my permission or without any knowledge from me that they were sold.

"Q. Boylen was purchasing sheep for you?

"A. He purchased sheep for me whenever he had something and called me up and I thought they were worth the money, no matter whether it was lambs or ewes."

Referring to the conversation in Pendleton which R. E. McGreer had in mind when he gave the testimony which we have already quoted, the defendant testified:

"* * * they was all up there, and they asked me to tell them what I had over there that belonged

to Tom Boylen, and I said just wait a minute; and I went downstairs and called up my attorney and asked him if it was all right to tell them the facts in the case, what I had over there, and I did, and I told them about the money that was there that I figured belonged to Tom Boylen for old ewes that he had sent over there for our boys to sell. Now that was the case, but there was nothing said in that room about the McGreer sheep in any manner that I know of whatsoever."

Mr. George Brewster, attorney for the plaintiff, testified that some time before this action was begun he had a conference with the defendant which was arranged by the latter's counsel, and that in its course

"We discussed those sheep at length, and Mr. Smeed told me that he had asked Tom Boylen to be looking out for a small band of sheep for him, that he wanted them full-mouthed and that Tom Boylen called him up, finally, told him that he had located just about what he thought he wanted; that he could get a bunch of 600 full-mouthed ewes at a price of $4.25 a head. Mr. Smeed told me that he told Tom at that time—there is something wrong, Tom, no one would sell full-mouthed ewes at that price, they are worth more, and that Boylen told him that the man from whom he was going to get the sheep was going out of business * * *. He discussed his dealings with Tom Boylen and said he had dealt with Tom Boylen for years."

If the testimony given by R. E. McGreer which we quoted is true, then Boylen sold to the defendant a band of sheep for $2,074 which cost Boylen that sum plus $188, inspection fees. In fact, the sheep cost Boylen more than $2,262 because, in effecting his transaction with the defendant, he expended sums in holding long distance telephone conversations with him. It would seem remarkable for Boylen to agree to sell the

sheep to the defendant for $2,074 when he knew from the actual facts that the sheep would cost him, upon purchase, in excess of $2,262. We must bear in mind the fact that Boylen had not yet bought the sheep from the plaintiff (at a cost of more than $2,262) when he agreed to sell them to the defendant for $2,074—assuming, of course, that the defendant told the truth when he said that he bought them from Boylen. In other words, Boylen knew before he made the purported sale to the defendant that he would incur a sizeable loss. All the above is especially remarkable in view of the fact that Boylen, when he made his alleged sale to the defendant, knew that the sheep were worth substantially more than $4.25 per head. It will be seen from the defendant's purported conversation with Brewster, as related by the latter, that before Boylen bought the sheep he told the defendant of the price which the owner (this plaintiff) asked for them— a circumstance compatible with a relationship such as joint ventures, but generally foreign to negotiations between a vendor and a prospective purchaser. The above circumstances lend significance to the testimony of R. E. McGreer which indicates that the sheep were purchased by Boylen and the defendant as joint adventurers. Clearly, this testimony is support for the averment of the complaint that the defendant and Boylen entered into a joint venture for dealing in this band of sheep and that Boylen, as agent for the joint venture, made the purchase. We need not hold that it represents the truth—the fact that it is in the record suffices for our purposes.

The quoted testimony of R. E. McGreer is ignored in the appellant's brief. The latter is confined to contentions that (a) Boylen, as principal, purchased the

sheep from the plaintiff on credit; and (b) if the terms of the sale called for cash at the time of delivery, they were waived by the manner in which the transaction was handled after the plaintiff had parted with possession of the sheep. Regardless of whatever merit those contentions may possess, the testimony given by R. E. McGreer is in the record and cannot be ignored when we consider the assignment of error. McGreer's testimony, if believed, renders the contentions about cash and credit immaterial.

If the testimony given by R. E. McGreer is true, and for present purposes we must assume that it is, Boylen and the defendant were joint adventurers in the purchase of the sheep involved in this action. *C. A. Babcock Co. v. Alma D. Katz*, 121 Or. 64, 253 P. 373; 30 Am. Jur., Joint Adventures, p. 63, § 14. If the defendant was a joint adventurer with Boylen in the purchase of these sheep, he, like Boylen, was liable to the plaintiff for their purchase price. *C. A. Babcock Co. v. Alma D. Katz*, supra, and 33 C. J., Joint Adventures, p. 871, § 93. If the two were joint adventurers, payment by the defendant to Boylen, of course, could not discharge his liability to the plaintiff. As we have said, we are compelled to believe for the purposes of considering this assignment of error that the two men were joint adventurers.

It is our belief that the circuit court did not err when it entered the orders now under consideration. The single assignment of error possesses no merit.

The judgment of the circuit court is affirmed.